State v. Baker.

———————

THE STATE, Respondent, v. BAKER, Appellant.

1. The State v. McO'Blenis, ante, p. 402, affirmed.

*Appeal from St. Louis Circuit Court.*

*Uriel Wright,* for appellant.

A review of the decision made by this court in the case of O'Blenis is respectfully and earnestly urged, 1st, because that decision was made by a divided bench on a constitutional question ; 2d, because of the importance of the question involved, regarded either as a limitation on the judiciary department of the government, or as a personal security of the citizen against the oppressive action of the government ; and, 3d, because of the grounds on which the decision is put by the majority of the court.

If the reasoning of this decision be properly understood by me, several propositions, urged in my former argument, are conceded, viz : 1st, It is granted that the provision of the bill of rights, supposed to have been violated, did not establish or seek to establish any rule of evidence ; 2d, It is conceded that it was not the object nor the effect of that provision to secure the right of cross-examination ; 3d, It is conceded that the provision contemplates and provides for this meeting "of the accused and the witnesses against him in " that tribunal where his guilt or innocence is to be finally passed upon"—that is, before the traverse jury ; 4th, It is admitted that this right is an important and valuable personal security—valuable as a test of the truth or falsehood of what is sworn by the witness against him ; but it is insisted that the right is not secured in all cases—that the provision is not universally applicable—that it establishes only

a wise general rule—that there are exceptional cases out of its operation—and that the case at bar was one of the exceptions. The decision is further understood to maintain that the exceptions were as well understood as the rule out of which they came ; and that as a consequence of this knowledge, in adopting the rule the framers of our bill of rights must be understood as adopting the exceptions.

The result of the reasoning employed in the decision is, that to express *in words* the true meaning of the bill of rights, it should be read in some one or all of the following phraseologies : 1st, "In all criminal prosecutions the accused has the right to meet the witnesses against him face to face, *except* in cases of dying declarations in reference to the same homicide, and in cases where the deposition of a witness has been regularly taken in a judicial proceeding against the accused in respect to the same transaction, and in his presence, when the subsequent death of the witness has rendered his production in court impossible ;" or 2d, "In all criminal prosecutions the accused has the right to meet the witnesses against him face to face, *except* in cases where necessity, or the proper administration of justice shall dispense with the presence of the witness in open court ;" or 3d, "*Except* in cases wherein necessity shall render a resort to subordinate evidence proper in furtherance of justice ;" or 4th, "*Except* in cases where, by the rules of the common law, subordinate testimony is legal."

I. An exception to a provision so fundamental as the constitutional declaration of the rights of a people can only be declared by the instrument itself. This is a clear result deduced from the nature and object of the instrument. It is organic, fundamental law—the only law that is fundamental, because unchangeable by the organism it creates. It is binding on all the parts of that organism—that is to say, on every department of the government. No modification, not the slightest, can be made of it by the judiciary, by the executive, or by the legislature. It is a prohibition on all, and its only sensible foundation is distrust of all. A power in either department of

the government to declare exceptions to its provisions not therein made, is incompatible with the idea of prohibition in the instrument. It is no longer a prohibition on that department which can make the exception. The power to create exceptions is a power above the constitution; and the power to declare exceptions not declared in the instrument is a power to create exceptions. The appellatives "wise," "expedient," "just," "necessary," applied to the exceptions created, constitute no limitations of the creating power; nor are they palliatives of the power exercised; much less are they authority. The power to create exceptions is a power to destroy the instrument. The instrument is of infinite obligation or of none. The judiciary may construe the constitution, but they must construe its words as they are written.

II. Tried by this test, there is no exceptional case which dispenses the meeting of the witnesses and the accused before the tribunal of final judgment. Not a word of the constitution hints at such exception. The words used are words of universality. "In *all* criminal prosecutions" this meeting shall transpire. If it had been added "without exception," the idea of universality would not be strengthened. The infinite comprehensiveness of of "all" renders "without exception" a tautological platitude. The added words might show a *desire* for *emphasis*, but they could not impart it. If the trial of Baker was a criminal prosecution, it was embraced by the clause, for it embraces "*all* criminal prosecutions." Can the court strike out the word "all" and insert "most" or "some;" or strike out "all" and insert nothing? And is not that precisely what the court in effect has done? Again, why did the framers of the constitution write "all" before "criminal prosecutions?" It must be assumed that they wrote it for a purpose. It must also be assumed that they chose the word to accomplish that purpose; and it can not be denied that the word selected is the most comprehensive in our language. It can not be denied that if their purpose was to cut off all exceptions to the rule they were about to establish, the selected word was the best word in our language

to accomplish that purpose. The only other thing necessary to the argument, to give it the force of demonstration, is to assume that they knew the meaning of the word. Even that assumption is not necessary, for it is susceptible of proof from the use they make of it in the same section. "In *all* criminal prosecutions the accused has the right to be heard by himself and counsel." (Constitution, art. 13, § 9.) Did they mean that there should be any exception to that? "In all criminal prosecutions the accused has the right to demand the nature and cause of accusation." Did they mean to cut off exceptions to that rule? "In *all* criminal prosecutions the accused has the right to have compulsory process for witnesses in his favor." Did they mean to allow exceptions to that rule? "In all criminal prosecutions on indictment or presentment the accused has the right to a speedy trial by an impartial jury of the vicinage." Was it their understanding that "practical wisdom" or "great expediency" or "necessity" should constitute an exception to this rule? "In all criminal prosecutions the accused can not be compelled to give evidence against himself." Did they mean that cases might arise in which compulsion would be lawful? "In all criminal prosecutions the accused shall not be deprived of life, liberty or property, but by the judgment of his peers or the law of the land." Was it their purpose to allow an exception to this rule? The only remaining part of this section is "in all criminal prosecutions the accused has the right to meet the witnesses against him face to face." Is not the question as proper in this case as in the preceding ones? Did they mean to be understood as allowing exceptions to this rule? On what known rule of construction can the same word, applied as a word of qualification seven times in the same section, be construed to have different significations in the minds of those who employed it? Did the framers of the constitution employ the word six times in the same sentence to cut off all exception, and in the seventh to create exceptions; and this too in the case of a word which has no signification in the law different from its vernacular import?

Add to this the absence of all intimation, suggestion or hint by them of a difference in the signification of the word as used by them in its application to the various subjects embraced in the section, and the discrimination assumed becomes impossible. Extend the subject of inquiry to the whole instrument, and in no part of it is this discrimination a possibility. Again, in construing the bill of rights of a people, special observance of the *words* of the instrument is a manifest duty, because they are intended to express limitations upon the powers of the government, and prohibitions upon every department thereof. Being limitations founded in distrust of every department of the government, and essential to liberty, it must be presumed that they are marked out with care : and since words, written words only, are employed to mark the boundaries of power, it must therefore be presumed that words are chosen for their aptitude to enunciate clearly and unmistakeably the limitations intended. Perspicuity—desirable at all times—becomes a necessity when limitations are to be put upon power, for power will not see a limitation unless it be clearly defined. In the enunciation of a bill of rights, it must be assumed that phraseology is studied. I submit with confidence that our language does not furnish a clearer paragraph than that provision of the bill of rights which is the subject of inquiry.

III. If exceptions were recognized by the common law to the rule in question, and such exceptions were known to the framers of our bill of rights at the time of its adoption, words of universality must be understood as intended to exclude the exceptions. In other words—because it was known that, by the practice of courts acting under the common law, cases had arisen in which the presence of the witness before the jury had been dispensed with, therefore a word of universality must be regarded as a word of exclusion. In England, before the adoption of our bill of rights, in all cases under the grade of high treason (which was governed by the statute of Edward, which demanded the witnesses in open court), the courts, acting only upon the prohibitions of magna charta, deemed it

within their power to shape the rules of evidence according to the exigencies of necessity, conveniency or expediency; and under this power, in several cases, they dispensed with the presence of the witness in open court. *First*, They allowed evidence taken before a coroner to be read against a man afterwards charged with the homicide by indictment. *Secondly*, They allowed depositions, taken under Philip and Mary, on the examination of all crimes under the grade of high treason, if taken in the presence of the accused, or when he might have been present, to be read on the trial before the jury in the following cases: 1st, when the defendant was dead at the trial; 2d, when he was spirited away by defendant; 3d, when he was insane at the time of the trial; 4th, when he was sick at the time of the trial; 5th, when he was beyond seas at the time of the trial, irrespective of the cause of his absence; and 6th, the courts sometimes put the defendant under duress of continued imprisonment unless he would consent to the taking of the deposition. Now while the English judges thus shaped the rules of evidence, with magna charta before them, no English judge for one hundred years has permitted the deposition of a witness, living or dead, to be read against the accused on a charge of high treason. The reason of this distinction is to be found in the statute of Edward, which demanded the two witnesses in open court at the trial. The statute required the witnesses in person, " if living ;" but no statute demanded their presence in any prosecution but that for high treason. No act of parliament from Philip and Mary to Victoria has ever authorized a magistrate to take a deposition on a charge of high treason. And every English authority, for one hundred years, admits that on a charge of high treason, or an appeal of murder, the deposition of the witness is not legal evidence, but he must meet the accused face to face. Unless a deposition be taken under a statute, it was deemed extra-judicial; for depositions in a criminal case were unknown to the common law. In other words, the judges of England found in the statute of Edward a prohibition or modification of the common law which

they could not find in magna charta.  This was "known" and "understood" also when our bill of rights was framed.  But more was known.  It was known that for a century after the passage of the statute of Edward referred to, when prisoners charged with high treason demanded the presence of witnesses against them at the trial, they were answered by corrupt prosecutors—aye, by some not deemed by us of "bad eminence," and by subservient judges claiming the judicial discretion of the common law—"the statute of Edward is repealed."  They knew furthermore that it was not until the English nation had been "schooled in adversity," and "Lord Coke had suffered disgrace at court," that it began to be conceded the statute of Edward was in force and had been from its passage.  (See Foster Crown Law, ——.)  Now if all this was known to the framers of our bill of rights in 1820—and that is the assumption—let us see on what knowledge they acted, what precedents they followed, or guarded against, when deliberating on the question, shall the presence of the witness against him in open court, before the tribunal having the power to pass finally upon his guilt or innocence, be the right of the accused ?  Is it a right so important that it should be set down in the bill of rights of a free people ?  If so, shall it be absolute, or shall it exist under modifications ; and if so, what modification ?  *First,* It was known to them that the rules of evidence, according to the course of the common law, did not allow the right to be absolute ; but on the contrary dispensed with the presence of the witness as often as necessity or convenience or a practical wisdom might determine.  *Secondly,* It was known that the provision of magna charta—"no person shall be deprived of life, liberty, or property, but by the judgment of his peers or the law of the land"—as construed by the judges of England, did not secure the right.  On the contrary, they held that in virtue of the common law there was a dispensing power in the courts, the measure of which was the power to mould the rules of evidence so as to meet the exigencies of proof—a power which necessarily included the right to declare those exigencies

as they might arise. *Thirdly*, It was known that the words of the statute of Edward, demanding the presence of the witnesses, if living, in all cases of high treason, had been judicially expounded in England to contain a prohibition not imposed by magna charta upon the course of the common law; and that by virtue of that prohibition no deposition of a witness, living or dead, was competent evidence against the accused on a charge of high treason. With these lights before them, several alternatives presented themselves to the framers of our bill of rights. *First*, They might say, the right is important, but—as it is recognized by the common law, and is familiar to that system, and generally obtains in practice, subject as is every other rule of the common law to modification under circumstances—and as the common law is a system which is already adopted by our statutes, we will trust the thing to the judicial legislation of the courts, and to such other regulations as the general assembly may deem wise and expedient from time to time ; we will not fetter either the courts or the legislature by declaring the right to be fundamental, or by prescribing its extent ; it shall not be set down ; it is not fundamental. *Second*, They might say, this is a fundamental right, and ought to be secured against invasion, but it shall be absolute only in a certain case—a criminal prosecution for treason, as in England ; in all other criminal prosecutions the right shall exist according to the course of the common law. *Third*, They might say, the right is fundamental and should be secured, and be absolute, except in certain specified cases ; or, *Fourth*, They might say, the right is fundamental, and should be enjoyed as a right absolute in every criminal prosecution of whatever grade of offence, and be exempt from invasion by the legislature or the judiciary in all cases. Now, it must be admitted that they were not willing to leave this right in the keeping of the common law—or within the good sense, sound discretion, and love of liberty, of the general assembly—or within the joint operation of the written and the unwritten law. If they designed to make the right absolute in all prosecutions for treason, a transcript of the statute

of Edward would have put the right beyond the power of any judicial precedent in England, except such as were made in bad times by subservient judges. If they designed to go further than to provide for a prosecution for treason—if they resolved to provide for all criminal prosecutions, but intended likewise that the right should not be so absolute, in any grade of accusation, as not to yield to exigencies—they had first to determine what exigencies should subordinate the right, and then point them out. If the judicial precedents of England were looked to on this question of policy, and they deemed them, all of them, safe and just relaxations of a fundamental principle of liberty, it was an easy work to engraft them on the constitution. If some of these precedents were deemed unwise or of doubtful expediency, a discrimination at once became necessary. And if, as I sincerely believe was the case, they looked at those English precedents, and saw their source as well as operation—saw that every relaxation was a rule or law made by the judges to meet an exigency as it arose, they being the power to determine the exigency as well as the authority to declare the extent and mode of the relaxation they could not fail to see that it was idle to attempt to give fixedness and permanence to any constitutional principle, if they subjected it to the power of judicial legislation. By the common law nothing is fixed—nothing is fundamental. It does not recognize any rule as "stiff and unbending." It is a vast system of rules of which it has been said, "they grew and were not made." * * * * The essential idea of a *constitutional* right is that it can not change—that it is so "stiff" it can not "bend" without breaking. * * * * The case of The State v. Atkins, 1 Overton, Tenn., 229, was the only precedent in point at the time of the framing of our constitution. * * It is said, "the great security of the accused, after all, is in the fundamental principle of the common law that legal evidence consists in facts testified to by some person who has personal knowledge of them, thus excluding all suspicions, public rumors, second-hand statements, and, generally, all hear-

say testimony, whether oral or written, from the consideration of the jury." The framers of our constitution manifested at least solicitude to throw around the accused every bulwark which might protect innocence against an unjust or wicked governmental prosecution, but they did *not* provide for him this greatest of all securities. The next general assembly may declare hearsay testimony legal and competent in all cases, and break no commandment of the constitution. The rules of evidence are not to be found in written constitutions. The legislative and judiciary departments of the government are trusted in this behalf. * * * But while the constitution does not provide what the witness shall say, it does provide the greatest security the wisdom of man has devised that what he does say shall be true. It does not provide that the witness shall speak only what he knows, but it does furnish a security that he shall not hurtfully to the accused say more than he knows. This greatest of all constitutional securities is *presence*—the presence of the witness face to face with the accused before that tribunal which holds the awful power of judgment. * * This security has been denied the defendant. * * English and American judges have confounded the right of presence with other and distinct rights. They have confounded it with the other right of cross-examination. Cross-examination *is* not presence ; nor is it a constitutional right. Others have confounded presence at the trial before the jury with presence elsewhere, and have treated presence elsewhere as a satisfaction of the constitution. Others base their decisions on the *danger* of enforcing this constitutional right in every case. Others rely upon the policy of subordinate rules in furtherance of justice. The constitutional provision is superior to policy. There can be no policy in denying a constitutional right. So too it has been thought that if the State can not be permitted to read a deposition against the accused, the accused can not be permitted to use a deposition in his defence. Was the bill of rights made for the protection of the State ? There is not the shadow of a pretence for reciprocity of rights in the case. The Ameri-

State v. Baker.

can decisions cited contain concessions which logically give up the question. * * * *

Why, I ask, are the facts contained in the deposition of a dead or absent witness not entitled to "full faith" at the hands of the jury who are to consider them? It is not because they are not facts sworn to by a witness who has personal knowledge. That is not the reason. If faith in the facts communicated be shaken, it is because of the absence of the witness— because the only test of their truth or falsehood provided by the constitution is taken from the jury. The *presence* of the witness is wanting, and that is all that is wanting; what is wanting is the very thing the constitution says shall *not* be wanting. * * * But how are the jury to determine the extent of their "faith" in the "facts thus communicated?" How are they to determine what would have been the measure of their faith in the witness if they had seen and heard him swear, so as to deduct the loss against the deposition? It is too manifest for further elaboration that on principle the thing can not be done; and in practice, the deposition is taken for truth, unless it be contradicted by itself or by independent evidence. * * *

When our constitution took up this principle of presence it is admitted the principle became fixed and unbending, but it is insisted the exceptions went with the principle. If so, the exceptions became by their elevation fixed beyond the reach of legislative or judicial action. It is apparent from this assumption that it is a matter of the greatest importance to know what exceptions went up with the principle. Are they only the exceptions declared by the English courts before the adoption of our constitution; or do they embrace such as may thereafter be declared by the courts as falling within the reason of the previous exceptions? I have shown that the declared exception of the deposition of a dead witness did not spring from any actual necessity; but if the basis of that exception be an assumed necessity, assumed and declared by the common-law courts of England creating the exception, are those exceptions, which hereafter may be declared by the English courts of common

law or our own to rest on the ground of such necessity, to become part of the constitution also? Again, are the constitutional exceptions to extend beyond the ground of assumed necessity? Some of the exceptions created in England by the courts do not even purport to rest on necessity; for example, the cases of the sick witness—the witness unable to travel—the witness who has gone across the straits of Dover to Calais, and is therefore " beyond seas"—the witness who has been spirited away—are cases of exceptions created from inconvenience, less or greater as the case may be. They rest upon a policy no higher than that which allows depositions to be taken *de bene esse*. Are these declared exceptions part of our bill of rights? And cases which shall hereafter arise coming within this mischief of inconvenience—declared judicial inconvenience—will they too make part of the fundamental law? If the exceptions which went up with the principle into the constitution are such as rest or are supposed to rest upon necessity, the courts must declare the necessity, and they will follow the precedents—they will hold that to be *necessity* which has been judicially so declared. If the wider basis of *inconvenience* shall determine the exception, what is inconvenience will be reached by the same process. Already has it been decided by the St. Louis Criminal Court that the deposition of a witness (taken before the examining magistrate) who was out of the state at the time of the trial was competent evidence against the accused. How long will it be before an absence of sixty miles from the place of trial shall be deemed judicial inconvenience sufficient to let in a deposition? One step more—if the bill of rights be not in the way, why shall not depositions be read in criminal as in civil cases, since the rules of evidence in both cases are the same?

I submit that exceptions are excluded by our bill of rights. 1st. Because no exception is declared in the constitution. 2d. Because, with a knowledge of many relaxations of the principle, while it remained a common-law principle, a word of universality is introduced which was unknown to the common law.

3d. Because any exception is necessarily a *total* surrender of the principle itself in the excepted case. 4th. Because the statute of Edward was designed and had the effect to cut off the common-law relaxations of the principle which had grown into precedents prior to its passage ; and our bill of rights is stronger against relaxations than was the statute of Edward. 5th. Because the letter, the clear letter, of the constitution, is against all exceptions. 6th. Because its letter is supported by a manifest and admitted reason. 7th. Because if the letter and reason of any provision of our bill of rights are not conclusive as a prohibition on the judiciary department of the government, there is no limitation upon judicial power. 8th. Because no suggestions of policy or necessity can modify or relax a constitutional right, though announced judicially by a hundred precedents. 9th. Because the precedents drawn from England are not in point, except such as furnish constructions of the statute of Edward, and they are against the exceptions. 10th. Because the American precedents cited are most of them from states that have not our bill of rights, and have never gone beyond the common law and magna charta in securing the rights of a free people — (such are the states of New York, South Carolina and North Carolina) ; and the remainder are based upon reasoning—repudiated by this court—which demonstrates a total misconception of the design and object of the clause in question, and which involves a confusion of the right secured with other and independent rights secured in the instrument ; and also because they are based upon the previous precedents made under the common law and the charter ; and lastly, because, if they were in point, they are not authority here.

IV. As to dying declarations, the courts put them on the ground that the dying man is not the witness ; the witness is he who swears to them in open court in the presence of the jury and the accused ; and therefore the constitution is not violated. But ingenuity has never yet been astute enough to make the officer, or scrivener under his direction, who testifies to what is

called the *preliminary proof*, the witness in the case. If a constitutional. right can be turned by such strategy, it ceases to be a thing of value.

*H. A. Clover*, (circuit attorney,) for the State, relied on the case of the State v. McO'Blenis.

RYLAND, Judge, delivered the opinion of the court.

The defendant was indicted at the September term, 1854, of the Criminal Court of St. Louis county, for wilfully, feloniously, on purpose, and of malice aforethought, assaulting, cutting, wounding and mutilating William O. Hoffman, with a knife, then and there being a deadly weapon. The act was charged to have been committed on the 14th day of March, 1854, at St. Louis, in St. Louis county.

The second count charges the act to have been done feloniously, on purpose, and of malice aforethought; and to have been done violently, cruelly, immoderately, and by means likely to produce death and great bodily harm;—charges the cutting, wounding and mutilating as in the first count.

The third count charges the assaulting and scourging with a cowhide, and cutting and wounding with a knife, to have been done feloniously and wilfully, and by the act and procurement of said Baker, giving, by such wounding, cutting, beating and scourging, unlawfully.and feloniously, great bodily harm to said Hoffman, so that his life was endangered and himself wounded and disfigured.

The defendant pleaded not guilty; a change of venue was taken from the Criminal Court to the St. Louis Court of Common Pleas, and a second change to the Circuit Court of St. Louis county. The defendant was found guilty under the third count, and acquitted on the first and second counts.

The State produced as a witness S. C. Simmons, who testified that he was recorder of the city of St. Louis in March, 1854; that the paper sworn to him is the official examination made by him as recorder in the case of the State v. Wilson C. Baker, Milo Smith and Benjamin Embree, on the charge of

feloniously wounding William O. Hoffman, with intent to maim. Baker, the defendant, was present at the examination by himself and his counsel, U. Wright.   Hoffman was sworn and his examination written down by the clerk of the recorder's court, and Hoffman subscribed his signature to the same when taken in the presence of the defendant Baker ; and at the time of the examination, conducted under my direction as recorder, Smith was discharged and Baker and Embree bound over to answer to the Criminal Court.   I, as recorder, attested the examination, and when certified by me, as it now appears, it was handed over to my clerk.   Hoffman is dead.   I saw him dead not a great while after the examination.   Baker and Embree gave bail.   The clerk of the recorder's court is appointed by the mayor ; the office is created by ordinance.   Hoffman's death was not caused by the injuries for which the examination was had.   He died from another cause.

The paper referred to by the witness was then offered in evidence by the State and objected to by the defendant as incompetent evidence under the constitution, and as irrelevant evidence under the issues of this cause.   The court overruled the objection and permitted the paper to be read in evidence.   The defendant excepted to this ruling and saved the point.   I am unwilling to insert this paper in the opinion of the court, because such a detail of facts had for the honor of humanity better remain where few will have occasion to read it.   The testimony of the physicians who attended to the wounds of Hoffman and managed the case for him is also omitted.   The testimony shows a most cruel and inhuman infliction of injuries and wounds on the naked body of Hoffman, and in such number and on such parts of his body as at least to have caused great bodily harm, if not to have endangered life.   The record shows that every instruction asked for by both parties was given.   Many of these instructions relate to the first and second counts in the indictment, and therefore are not necessary to notice, as the jury found the defendant *not guilty* of the offences in these counts.

The third and eighth instructions are those principally com-

plained of by the defendant. Now in regard to instructions we must look at the evidence offered and given before the jury. The third instruction as well as the eighth must be considered in relation to the case as made out. The court did not intend nor could the jury understand that by the *wounding* mentioned in this instruction any accident or unintentional wounding was meant. When the facts in proof are considered, the instruction was not liable to mislead the jury; it must be understood in reference to the case made out before them. We can not reverse by reason of any thing said against this instruction. The sixth and seventh instructions put the case very fully and fairly before the jury; and the defendant can not complain of any thing in the eighth instruction with propriety. This instruction is very lengthy, and unnecessarily embraces hypothetically many of the facts detailed in proof, and is liable to criticism; but this court is not satisfied that any illegality is contained in it, or that it operated on the minds of the jury prejudicially to the rights of the defendant.

Upon all the questions arising then on this record, except the admissibility of the examination of Hoffman before the recorder's court, this court is unanimously of opinion that there is no error. The question on admitting that examination has been heretofore settled by a majority of the court in the case of the State v. McO'Blenis. Judge Ryland dissents on this point, and refers to his opinion in the O'Blenis case. The judgment of the court below is affirmed; Judge Ryland dissenting on the one point only.

The case of the State v. McO'Blenis was decided at the March term, 1856; that of Baker at the October term, 1856. The constitutional question involved in the cases of O'Blenis and Baker has again come before the Supreme Court in a somewhat different form. In the case of Houser, indicted for murder, the St. Louis Criminal Court, upon the trial, admitted in evidence against the accused a deposition taken before the committing magistrate, where it appeared that the witness was out of the state. There was no proof of her death. Houser was convicted of murder in the first degree—[Rep.